MARGO L. FRASIER, J.D., C.P.O.
3300 PLOVER RAIN WAY
PFLUGERVILLE, TEXAS 78660

March 16, 2021

Mr. Chad Rook
Ms. Lee Correa
Flowers & Davis, PLLC
1021 ESE Loop 323, Suite 200
Tyler, Texas 75701

Re: *Christine Parker, et al. v. Smith County, et al.;* United States District Court, Eastern District of Texas, Tyler Division, Civil Action No. 6:19:CV-12

# REPORT OF EXPERT
# MARGO L. FRASIER, J.D., C.P.O.

**INTRODUCTION:**

My name is Margo Frasier. I am presently self-employed as a criminal justice consultant and expert. I have been retained as an expert witness in the matter of *Christine Parker, et al. v. Smith County, et al.;* United States District Court, Eastern District of Texas, Tyler Division, Civil Action No. 6:19:CV-12.

I have been asked to render opinions relating to the actions of the employees and officials of the Smith County Sheriff's Office during the incarceration of Teddy Parker (Parker) on May 14, 2017, when Parker was arrested for public intoxication and booked into the Smith County Jail. Specifically, Plaintiff claims Parker's rights under the 4th and 14th Amendments to the United States Constitution were violated due to an alleged use of excessive force and failure to intervene in an alleged use of excessive force.

Specifically, I have been asked to review documentary material related to the actions of the employees of the Smith County Sheriff's Office during Parker's incarceration, the pleadings of the parties, relevant training, regulations, statutes, and case law for the purpose of determining whether Smith County subjected Parker to a violation of his 4th and 14th Amendment rights which resulted in his death.

**QUALIFICATIONS OF EXPERT:**

I have significant experience in all facets of law enforcement and corrections. Presently, I am self-employed as a criminal justice consultant and expert. As part of my duties as a consultant, I have been appointed by federal judges to oversee the implementation of reforms of the Orleans Parish Jail (New Orleans, Louisiana) and Metropolitan Detention Center of Bernalillo County (Albuquerque, New Mexico) under the terms of consent judgments. As part of my duties, I oversee provisions related to the protection of inmates and use of force. Previously, I was employed as the

1

EXHIBIT "E"

Police Monitor for the City of Austin. My duties as Police Monitor included overseeing all the internal affairs investigations, including those involving allegations of excessive use of force, of the Austin Police Department and providing recommendations on how to improve the Austin Police Department. Prior to joining the City of Austin, I was a Senior Associate with MGT of America, Inc., where I provided litigation support, expert witness services, and consulting in criminal justice issues. Prior to joining MGT, I was an Assistant Professor of Criminal Justice in the College of Criminal Justice at Sam Houston State University in Huntsville, Texas. Prior to joining the faculty at Sam Houston State University, I was the duly elected Sheriff of Travis County (Austin), Texas. I assumed office as Sheriff of Travis County, Texas, on January 1, 1997, and served as the Chief Law Enforcement Officer and Chief Corrections Officer of Travis County, Texas, until December 31, 2004.

I graduated from Sam Houston State University with a Bachelor of Science degree with honors in Criminology and Corrections in 1974. I received thirty hours of credit towards a Master of Arts degree in Criminal Justice Management from Sam Houston State University. I received my Juris Doctor with high honors from Florida State University College of Law in 1984. I am certified both as a peace officer and jail officer by the Texas Commission on Law Enforcement (TCOLE). I am licensed as an attorney in the State of Texas.

During my 45 plus years of experience, I have worked at a state prison in Texas; worked in a number of different capacities within the Travis County Sheriff's Office; worked at and managed a county jail system; worked for the legislative committee which provided oversight of the jail and prison systems of the State of Florida; represented, as an attorney, numerous cities, counties, city officials and county officials in litigation related to law enforcement, corrections, and employment law; served as Sheriff, and, therefore, Chief Law Enforcement Officer and Chief Corrections Officer, of Travis County, Texas; provided criminal justice consultation; served as the court appointed monitor of consent judgments and settlement agreements, and served as Police Monitor of the City of Austin.

In addition, from 1997 to 2004, I was on the faculty at Saint Edward's University in Austin, Texas. At Saint Edward's University, I taught criminal justice courses including courses on American Policing, Corrections, and Juvenile Justice. While on the faculty at Sam Houston State University from 2005 to 2008, I taught criminal justice courses including Criminal Law, Criminal Investigation, Professionalism and Ethics in Criminal Justice, Legal Aspects of Corrections, Seminar on Administration and Organization, and Legal Aspects of Criminal Justice Management. Specifically, as part of the courses on Legal Aspects of Criminal Justice Management and Legal Aspects of Corrections, I taught the legal principles related to the liability of criminal justice agencies for the actions of their employees and liability of employees; specifically, those related to issues of training, classification, supervision, use of force, duty to protect, and provision of medical and mental health treatment.

I have extensive experience and have provided consulting, instructional, and legal services in such areas as training, classification, security, use of force, duty to protect, provision of medical and mental health treatment, search and seizure, supervision of staff, inmate rights, mental health laws, employment matters, and employee discipline. My experience includes instructing at the National Sheriffs' Institute. I have developed and implemented policies and procedures which relate to

almost every aspect of the operation of a law enforcement agency and a correctional agency; particularly those required by the Texas Commission on Law Enforcement (TCOLE) and the Texas Commission on Jail Standards (TCJS). I am extremely familiar with the statutes and case law of the United States which relate to the application of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the Rehabilitation Act of 1973 and the Americans with Disabilities Act in a correctional setting. I am particularly familiar with the duties imposed on a Sheriff or Chief and/or his/her deputies or officers. I have extensive experience in analyzing a particular incident that has allegedly occurred in an employment setting, law enforcement setting, or correctional setting to determine whether public officials acted in accordance with accepted procedures consistent with competent law enforcement and/or corrections training and within the laws and Constitutions of the United States and the State of Texas, whether an administrator failed to enact any policy or procedure that he/she is required to adopt, whether law enforcement and/or corrections officials have acted outside the range of acceptable law enforcement and/or corrections discretionary acts, and whether the conditions of confinement of a jail or prison are constitutional.

As the Sheriff of Travis County, Texas, I was the head of an agency which employed over 1300 employees and had a budget for 2004-2005 of over $90 million dollars. As the Chief Law Enforcement Officer and Chief Corrections Officer, I was responsible for the supervision of the jail and supervision of law enforcement officers patrolling, investigating, and enforcing criminal laws within Travis County. Additionally, I was responsible for the provision of medical and mental health treatment to the inmates housed in the Travis County Jail system. Additionally, I was responsible for the oversight of the employment and training practices of the Sheriff's Office to ensure compliance with state and federal regulations and statutes and the United States Constitution. As the former Police Monitor of the City of Austin, former Sheriff, former Assistant Professor of Criminal Justice, court appointed monitor of jail conditions, and consultant, I am extremely familiar with the statutes which relate to employees of police departments and sheriff's offices and the liability of criminal justice agencies for the actions of their employees; specifically, those related to issues of training, supervision, search and seizure, provision of medical and mental health treatment, duty to protect, and use of force.

During my time as Sheriff, I was a member of the Sheriffs' Association of Texas, National Sheriffs' Association, the Major County Sheriffs' Association, and the National Executive Institute Associates. I was elected to the Board of Directors of the National Sheriffs' Association by a vote of the membership in 2002 and served through 2004. I was elected to be the Treasurer of the Major County Sheriffs' Association by a vote of the membership in 1999 and served as treasurer through 2001. I was elected to be the Vice-President of the Major County Sheriffs' Association by a vote of the membership in 2002 and served as Vice-President through 2003. I was elected to be the President of the Major County Sheriffs' Association by a vote of the membership and served as President during 2004. I was twice selected by the Combined Law Enforcement Associations of Texas as the Administrator of the Year for the State of Texas. I currently serve as Vice-President of the National Organization of Civilian Oversight of Law Enforcement. I hold a certification of Certified Practitioner of Oversight from the National Organization of Civilian Oversight of Law Enforcement.

Details of my experience and education may be found in my resume attached hereto as Exhibit A.

Details of other matters in which I have testified may be found in the listing attached hereto as Exhibit B.

**COMPENSATION:**

I am being compensated for my time at a rate of $275.00 per hour.

**METHODOLOGY:**

In arriving at my opinions, I have examined the following:

1. Plaintiff's Original Complaint;
2. Smith County Defendants' Answer to Plaintiff's Original Complaint;
3. Original Answer of the City of Tyler Defendants;
4. County Defendants' Partial Motion to Dismiss Plaintiffs' First Amended Complaint;
5. City of Tyler Disclosures and accompanying attachments;
6. Plaintiff's Disclosures and accompanying attachments;
7. Plaintiff's Rule 26(a)(2) Expert Witnesses Disclosures and exhibits;
8. Smith County's Disclosures and accompanying attachments;
9. Defendants' (City of Tyler and officers) Supplemental Disclosure (6/17/2020);
10. Defendants' (City of Tyler and officers) Supplemental Disclosure (7/22/2020);
11. Defendants' (City of Tyler and officers) Expert Reports;
12. Amended Docket Control Order;
13. Second Amended Docket Control Order;
14. Third Amended Docket Control Order;
15. Plaintiff's Expert Reports;
16. Deposition of Christine Parker;
17. Deposition of Lionel Hernandez and exhibits;
18. Deposition of Jose Iglesias and exhibits;
19. Deposition of Shawn Jones and exhibits;
20. Deposition of Zane Lucas and exhibits;
21. Deposition of Raquel Rodriguez and exhibits;
22. Tyler Police Department General Orders;
23. Protective Order;
24. Discovery Order;
25. Letter from K. Dollahite to Dr. St. Lenfest regarding blood vials;
26. Photographs from Southwest Forensics;
27. Records from UT Heal East Texas;
28. Affidavit for Authentication of Medical Records and records;
29. Plaintiff's Objections and Responses to Defendants City of Tayler, Officer Brandon Lott, and Joshua Smedley Request for Interrogatories;
30. Plaintiff's Responses to Defendant's Smith County and Individual Defendant's First Set of Interrogatories;
31. Smith County jail policies;
32. Smith County Defendants' First Supplement Disclosures and attachments;
33. Relevant statutes, regulations, and codes including the regulations of the Texas Commission on Jail Standards and TCOLE; and

34. Relevant case law.

Additionally, I have examined the conduct of Smith County considering my experience as a law enforcement and corrections officer, administrator, and educator. The opinions set forth herein are based upon analysis of these facts by applying my law enforcement, corrections, administrative and teaching experience; legal education; training; personal knowledge of the applicable amendments to the United States Constitution and the applicable provisions of the law of the United States; knowledge of the applicable provisions of the Texas statutes and codes, particularly the regulations of the TCJS; and knowledge of training customarily provided to jail officers in Texas through TCOLE. My opinions are also based on my understanding of the facts and circumstances concerning the roles of the various employees and officials of the Smith County Sheriff's Office, evidenced by the materials I have examined and my personal training and experience, particularly in law enforcement training, in the events of which Plaintiffs complain.

My opinions are based on:

- Parker was arrested by the Tyler Police Department for public intoxication on May 14, 2017.
- During the arrest and during the transportation, Parker exhibited erratic behavior.
- The Smith County Jail operates a central booking area for all law enforcement agencies in Smith County.
- When Parker was brought into the booking area at approximately 6:30 p.m., he was under arrest for public intoxication. While Parker was under arrest for public intoxication, he was able to walk on his own. While Parker was able to walk into the booking area on his own, his behavior was erratic in that he would be cooperative one moment and uncooperative the next.
- Smith County has a policy that inmates are not allowed to wear any jewelry and that all jewelry is to be removed during booking. When jail officers attempted to remove Parker's earrings upon intake, they were unable to do so due to a combination of Parker's skin being sweaty and Parker's erratic movements.
- Parker was then taken to the violent cell so he could be seated, and jail officers could again attempt to remove the earrings. Jail officers struggled for several minutes in their attempt to remove the earrings. During that time Parker can be seen and heard on video again acting erratically which made it even more difficult to remove the earrings. During this time, Parker was seated on the floor with his hands cuffed behind his back. While jail officers attempt to restrain Parker from moving his body, particularly his head, only the minimum amount of necessary force was used.
- Deputy Hernandez placed the lower half of one leg on Parker's legs to keep Parker from being able to rise up and placed his hand against Parker's upper shoulder in an attempt to keep Parker from moving.
- Deputy Rodriguez, at times, placed her hand on Parker's head and shoulder in an attempt to stop Parker from moving.
- Deputy Lucas placed his hand on Parker's should in an attempt to stop Parker from moving.
- Deputy Iglesias entered the cell to remove Parker's shoes and socks. To keep Parker's lower legs from moving, Deputy Iglesias rested one foot on the side of Parker's lower leg.

5

- Deputy Iglesias did not stand on Parker.
- After several minutes, Parker spit in the face of one of the jail officers. One of the police officers from the City of Tyler pulled Parker's shirt up to prevent Parker from being able to spit on officers again. The officers could be heard asking for a spit mask to be brought.
- A spit mask would have been futile during the incident as it would have prevented the officers and deputies from being able to reach Parker's ears to remove the earrings.
- While Deputy Rodriguez, at times, had her hand on Parker's head, it does not appear that she used her hand to cover Parker's mouth or nose and definitely did not squeeze Parker's nostrils.
- Within the next two minutes, jail officers noticed that Parker had stopped breathing normally and immediately summoned medical assistance.
- EMS was called and Parker was transported to the hospital where he died two days later. His death was ruled an accidental death due to the toxic effects of methamphetamine.
- The Smith County Sheriff's Office notified the Texas Rangers and requested that the Texas Rangers take over the investigation of Parker's death. The Texas Rangers conducted a thorough investigation of the death including reviewing the various videos of the incident and statements. The Texas Rangers did not find criminal conduct but turned the case over to the District Attorney. The District Attorney found no criminal conduct had occurred and declined to file charges or prosecute.
- The Smith County Jail has a set of policies which staff are trained on. The policies include policies on the use of force and booking procedures.
- Smith County Jail has a training program for its jail officers which meets the minimum required by TCOLE.

My opinions are also based on my review and study of the materials listed and an ongoing review of professional and scholarly literature regarding the duties and responsibilities of Sheriffs, Chiefs, law enforcement officers, and legal requirements.

I have analyzed the actions of Smith County and its employees considering the Constitutions of the United States and the State of Texas, the statutes and codes of the State of Texas and the United States, TCOLE and TCJS regulations, clearly established jail administration practices and standards, and licensing and training of law enforcement and corrections officers.

**OPINIONS:**

1. There is no information or evidence in the record I have analyzed indicating that Smith County or its employees violated the 4th or 14th Amendments to the United States Constitution as to the manner in which Parker was treated or that the conditions of confinement of the Smith County Jail were unconstitutional. To the contrary, Smith County:

    a. adopted and followed policies regarding the use of force;
    b. used minimal force when dealing with Parker;
    c. trained the jail officers in accordance with TCOLE; and
    d. when Parker became unresponsive, immediately summoned medical assistance and EMS and began CPR while waiting for EMS to arrive.

2. Plaintiff's expert agrees that the policies and training provided by Smith County are appropriate and adequate.

3. Given that Parker was displaying erratic behavior and jail officers were having difficulty removing his earrings as a result, the jail officers, in particular, Deputy Rodriguez, would have had, based on their training, a rational basis for their belief that that necessary and reasonable force should be used to place Parker in the violent cell so that he could sit down on the ground while they attempted to remove the earrings.

4. In the exercise of their discretion, and based upon fairly standardized training on the basic tactical and legal considerations related to use of force by jail officers and law enforcement officers in Texas, an officer from another jurisdiction who had no involvement in this case, like the involved officers, could have reasonably and appropriately reached the same conclusion the officers did that Parker's behavior required the officers to use necessary and reasonable force to seat Parker on the ground and secure him.

5. The jail officers, in particular, Deputy Rodriguez, Hernandez, and Lucas, would have had based on their training, a rational basis for their belief that necessary and reasonable force should be used to remove Parker's earrings.

6. The reasons for removing the earrings are many; particularly earrings that appeared to valuable. Earrings and other jewelry can be used as currency in a jail. Other inmates may attempt to steal earrings and other jewelry from an inmate. An inmate can use the earrings for self-harm by either using them to cut themselves or by swallowing them. An inmate can use the earrings to damage the walls of the violent cell.

7. Jail officers are trained to utilize multiple officers to secure an inmate so as to lessen the likelihood of injury to both officers and the inmate and to quickly restore order.

8. A spit mask would have been futile during the situation at hand as it would have prevented the deputies and officers from reaching Parker's earrings.

9. Officers are trained that once a spit mask or other barrier to spitting is in place that it should not be removed while continuing to be up close to the inmate as there is a likelihood that the inmate will spit again. Officers are trained that body fluids, such as spittle are dangerous to officers; particularly if the inmate is a narcotics user.

10. There is no evidence to indicate that the employees of the Smith County Sheriff's Office were inadequately trained. Particularly, there is no evidence that any failure to train the employees, if any failure did exist, amounted to deliberate indifference on the part of any policymaker for Smith County. In fact, the evidence is to the contrary. The involved employees met the requirements for training for the State of Texas as outlined by TCOLE standards, including training in use of force. Plaintiff's expert agrees that the training provided was appropriate and adequate.

11. At the time of the incident in question, there was nothing to put Smith County on notice that its employees were inadequately trained; much less plainly incompetent. To the contrary, the involved employees met the requirements for training as mandated by TCOLE.

12. There is no evidence that Smith County had or has a policy, custom, or practice of empowering its deputies or officers to use excessive force. In fact, the evidence is to the contrary. Plaintiff's expert agrees that the policies are appropriate and adequate.

13. There is no evidence that Smith County has a policy, custom, or practice of failing to adequately supervise or train its officers.

14. At the time of the incident in question, Smith County did not have a custom, practice, and/or policy of failing to adequately train or supervise its employees to comply with Smith County Sheriff's Office policies or state statutes or regulations. In fact, the evidence is to the contrary. Smith County had a field training program which trained its employees on the policies.

15. Smith County was not deliberately indifferent to a substantial risk of excessive force being used against Parker in that it:

    a. adopted policies requiring officers to follow state statutes and regulations including the Code of Criminal Procedure and Penal Code;
    b. provided for adequate training of the employees of the Smith County Sheriff's Office met the state mandated training; and
    c. provided for adequate supervision of the officers of the Smith County Sheriff's Office.

16. There is no objective evidence that indicates any policymaker of Smith County acted with deliberate indifference in regard to any training and/or supervision that the employees of the Smith County Sheriff's may have required in that there is nothing that would suggest a pattern of conduct which would have put a policymaker on notice that additional training and/or supervision was needed.

17. There is no objective evidence that indicates or suggests that the policies of the Smith County Sheriff's Office were in any way inadequate. If there were inadequacies in the actions of any of the employees involved, there was nothing so obvious in previous incidents to suggest that a policymaker of Smith County acted with deliberate indifference, had notice of an inadequate policy, and/or chose not to address it.

18. The information or evidence in the record that I have analyzed indicates that the employees of the Smith County Sheriff's Office who dealt with Parker during the booking process took what they thought were reasonable steps in dealing with him.

19. In particular, there is no evidence that Deputy Rodriguez would not have had, based on her training, a rational basis for her belief that that necessary and reasonable force should be used to place Parker in the violent cell so that he could sit down on the ground while they attempted to remove the earrings, that placement of her hand on his shoulder and head were reasonable, that Parker's shirt should be pulled up to prevent Parker from spitting on the deputies and officers, and that Parker was not at risk of serious harm until the time he ceased breathing.

20. In particular, there is no evidence that Deputy Hernandez would not have had, based on his

8

training, a rational basis for his belief that that necessary and reasonable force should be used to restrain Parker in the violent cell so that he could sit down on the ground while they attempted to remove the earrings, that placement of his lower leg on Parker's legs would assist in keeping him from moving, placement of his hand on his shoulder was reasonable, that Parker's shirt should be pulled up to prevent Parker from spitting on the deputies and officers, and that Parker was not at risk of serious harm until the time he ceased breathing.

21. In particular, there is no evidence that Deputy Lucas would not have had, based on his training, a rational basis for his belief that that necessary and reasonable force should be used to place Parker in the violent cell so that he could sit down on the ground while they attempted to remove the earrings, that placement of his hand on his shoulder was reasonable, that Parker's shirt should be pulled up to prevent Parker from spitting on the deputies and officers, and that Parker was not at risk of serious harm until the time he ceased breathing.

22. In particular, there is no evidence that Deputy Iglesias would not have had, based on his training, a rational basis for his belief that that necessary and reasonable force should be used to place Parker in the violent cell so that he could sit down on the ground while they attempted to remove the earrings, that placement of his foot against Parker's legs while he removed Parker's shoes and socks were reasonable, that Parker's shirt should be pulled up to prevent Parker from spitting on the deputies and officers, and that Parker was not at risk of serious harm until the time he ceased breathing.

23. In the exercise of their discretion, and based upon fairly standardized training on the basic tactical and legal considerations related to use of force by jail officers and law enforcement officers in Texas, an officer from another jurisdiction who had no involvement in this case, like the involved officers, could have reasonably and appropriately reached the same conclusion the officers did that Parker's behavior required the officers to use necessary and reasonable force to attempt to remove his earrings.

24. The only policymaker of Smith County for the Smith County Sheriff's Office at the time in question was Sheriff Larry Smith and there is no evidence that he was directly involved in the incident regarding Parker.

My opinions are based on Plaintiff's pleadings as currently written. I reserve the right to modify my opinions should additional facts be alleged, or additional parties named to justify such modification.

Sincerely,

*Margo L. Frasier*

Margo L. Frasier